**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **VICKI L. LEWIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:05-CV-00334** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Vicki L. Lewis appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying Lewis's application under the

Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"),

and Disabled Widow's Insurance Benefits ("WIB"). (Docket # 1.)  The appeal was referred to

the undersigned Magistrate Judge on October 30, 2006, by District Judge Theresa Springmann

for the issuance of a Report and Recommendation. (Docket # 12.)

Having reviewed the record and pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.1(d)(1), the undersigned Magistrate Judge recommends that the Commissioner's decision be

AFFIRMED.  This Report and Recommendation is based on the following facts and principles of

law.

## I.  PROCEDURAL HISTORY

On March 12, 2003, Lewis applied for DIB and WIB, alleging that she became disabled as of September 1, 2001. (Tr. 36-45.)  The Commissioner denied her application initially and upon reconsideration, and Lewis requested an administrative hearing. (Tr. 31-32.)  On August 23, 2004, Administrative Law Judge ("ALJ") Frederick McGrath conducted a hearing at which Lewis, who was represented by counsel, and a vocational expert testified. (Tr. 282-324.)

On April 18, 2005, the ALJ rendered an unfavorable decision to Lewis, concluding that she could return to her past relevant work. (Tr. 14-23.)  The Appeals Council denied Lewis's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-10.)  On September 14, 2005, Lewis filed a complaint with the district court, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II.  PLAINTIFF'S ARGUMENTS

Lewis points to four errors in the Commissioner's final decision.  Specifically, Lewis contends that the ALJ erred by: (1) failing to assign controlling weight to the opinions of Dr. Lazoff and Dr. Canavati; (2) discounting the credibility of her testimony concerning her debilitating limitations; (3) improperly considering her depression; and (4) failing to consider her receipt of Indiana Medicaid benefits. (Br. in Supp. of Pl.'s Compl. to Review Decision of Commissioner of Social Security Administration ("Opening Br.") at 6-15.)

### III.  FACTUAL BACKGROUND[1]

#### A.  Background and Daily Activities

At the time of the ALJ's decision, Lewis was fifty-six years old, had a high school education, and had past relevant work experience as a bartender, waitress, secretary, small parts assembler, quality inspector, and cashier. (Tr. 34, 43, 57-64, 80.)  Lewis alleged in her DIB application that she became disabled as of September 1, 2001, due to degenerative disk disease of the lower spine, arthritis in her neck, depression, and hypertension. (Tr. 37, 68.)  However, at the time she filed her DIB application in February 2003, Lewis was still working as a bartender four days per week, five hours per day. (Tr. 38, 57-58.)

At her hearing, Lewis testified that she lives by herself in a house with her three little dogs. (Tr. 287.)  She reported that she independently performs her self care and light house work, as well as caring for her pets. (Tr. 304-06.)  Lewis also stated that she drives an automobile with a manual transmission, but "not very much anymore because of [her] knee and [her] back and the shifting." (Tr. 305-06.)  She further explained that she performs her own grocery shopping, though she "put[s] everything in smaller bags and get[s] more bags." (Tr. 307.)  As to leisure activities, Lewis reported that she does not have any hobbies, but occasionally visits her mother, her daughter, and her two grandchildren, who all live nearby.[2] (Tr. 305, 308.)  When asked by the ALJ what she does in an average day, Lewis responded:

---

[1] The administrative record in this case is voluminous (324 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[2] Lewis stated that she has tried in the past to babysit for her two grandchildren, who were two and three years old at the time of the hearing, but no longer does so, explaining that she "can't lift them or do anything." (Tr. 305.)

"Nothing.  I don't do hardly anything.  I eat, let the dogs out to go to the bathroom, sometimes take them on walks.  Sometimes I go grocery shopping." (Tr. 308.)

Upon further questioning, however, Lewis confided that she also performs services for her aged mother, for which she receives compensation in the amount of $600 to $700 per month.[3] (Tr. 311-15.)  For example, Lewis testified that she occasionally buys her mother's groceries, pays her bills, takes her to the doctor, and hires various caretakers for her. (Tr. 311-15.)

When asked about her physical problems, Lewis testified that she has "severe pain" in her left leg, which she had been experiencing for two years prior to the hearing. (Tr. 296-97.) She reported that at the time she applied for DIB, her leg pain was a "seven" on a scale of "one" to "ten" with "one" meaning no pain and "ten" meaning extreme pain, but that it would reduce to a "five" with medication. (Tr. 297.)  When asked to describe her pain at the time of the hearing, Lewis stated that it was a "ten" and was "excruciating," though upon further questioning she admitted that she had taken no pain medication for it. (Tr. 297-98.)

Lewis also reported that she sometimes experiences muscle spasms in her left leg. (Tr. 298.)  She explained that her spasms are triggered by staying in one position for any length of time, and thus she tries to "keep moving." (Tr. 298.)  Lewis also stated that she obtains relief from her spasms within forty-five minutes of taking medication.[4] (Tr. 298.)  She reported that though she has never tried physical therapy, she "was looking into" it since she was recently approved for Medicaid health benefits. (Tr. 298-99.)

---

[3] Curiously, when asked earlier in the hearing whether she had "any income at the present time," Lewis answered, "No." (Tr. 287.)

[4] Lewis reported that she experiences no side effects from her medication. (Tr. 298.)

Lewis next testified that she had been suffering from increasing neck pain and stiffness during the past five years. (Tr. 299-300.)  She stated that her pain ranges from a "five" to an "eight," depending on which direction she moves her neck. (Tr. 299-300.)  She further explained that with medication, her neck pain reduces to a "four." (Tr. 300.)

Lewis then described her lower back pain. (Tr. 300-01.)  She explained that it started eight years earlier as a "two" or "three," but increased "almost from day to day." (Tr. 300-01.)  She reported that when her back pain reached a "seven" or "eight," which was about two years prior to the hearing, she stopped working. (Tr. 301.)  She further testified that her current pain is a "ten" and "is unbearable," regardless of whether she takes pain medication, explaining that the pain medication "doesn't help it." (Tr. 301.)  Lewis also confided that she has not received treatment or "gone for physical therapy or anything," other than obtaining a consultation from a neurologist. (Tr. 301-02.)  Lewis did mention that Dr. Lazoff recommended she try trigger point injections, but that she did not pursue them because of financial constraints. (Tr. 303.)

In addition, Lewis testified that her hands "go cold or limp . . . every once in a while," elaborating that when it occurs she has no "control over them" and they "just hang there." (Tr. 302.)  She stated this happens "[p]robably once every couple months or so," yet confided that she has received no medical intervention for this phenomenon. (Tr. 302.)

As to her general physical ability, Lewis reported that she can walk uninterrupted for ten minutes and stand uninterrupted for ten minutes, provided that she can "keep shifting," but that she "can't really sit very long at all" as she has to "keep moving." (Tr. 306-07.)  She reported that she can lift "hardly anything," explaining that it hurts to lift a gallon of milk, though she can accomplish it. (Tr. 307.)  When asked by the ALJ if she has any problems carrying things other

5

than weight, she responded that she has "extreme pain" and that she just "can't lift or carry anything." (Tr. 308.)  She further explained that she cannot perform any pushing or pulling. (Tr. 308.)

As to her mental status, Lewis confided that she suffers from depression, which she attributed to her unemployment in the previous year, her physical condition, and simply "losing [her] independence." (Tr. 303-04.)  She admitted that her family physician prescribed Paxil, but that she had only begun taking it in the two to three weeks immediately preceding the hearing. (Tr. 303.)  She elaborated that she "started it and then . . . quit it and then . . . started it again," attributing her inconsistency to her limited finances. (Tr. 310.)  Lewis stated that this pattern was fairly typical of her prescription use, as she would use samples provided by her physician, but could not afford to keep paying for the medication. (Tr. 311.)

## B.  Summary of Medical Evidence

On February 21, 2001, Lewis visited Thomas Miller, M.D., her family practitioner, for a recheck of her hypertension, reporting that she "has been feeling good." (Tr. 144.)  She complained, however, of some pain in her left hand, which worsened upon movement. (Tr. 144.)  Dr. Miller observed that Lewis had changes consistent with degenerative joint disease in her left hand, prescribed a splint, and recommended that she take over-the-counter anti-inflammatory medication. (Tr. 144.)

On June 3, 2002, Lewis visited Dr. Miller for a recheck of her hypertension, reporting that she was "feeling well." (Tr. 141.)  He discussed a diet and exercise regime with her, noting that she was having trouble paying for her current medications. (Tr. 141.)

On January 10, 2003, Lewis returned to Dr. Miller, complaining of discomfort in her

6

lower back. (Tr. 140.)  Upon examination, Dr. Miller noted that Lewis had some tenderness over the left sacroiliac joint, but that she had full range of motion. (Tr. 140.)  He assigned her a diagnosis of sacroiliitis and recommended that she take over-the-counter anti-inflammatory medication and begin stretching exercises. (Tr. 140.)

On March 5, 2003, Lewis saw Dr. Miller for a "disability physical," complaining of severe pain in her neck and back that caused her to "crawl out of bed" in the morning. (Tr. 136.) He ordered MRIs of her cervical and lumbar spine, commenting that her x-rays from 1998 showed severe degenerative disc disease and foraminal stenosis of the cervical spine. (Tr. 136.) The MRI of her cervical spine showed multiple levels of degenerative disc disease and some foraminal narrowing, but no evidence of focal disc protrusion or focal spinal stenosis, while the MRI of her lumbar spine showed degenerative disc disease throughout the lumbosacral area with anterolisthesis at L4-L5, but no evidence of focal stenosis, lateral recess stenosis, or focal disc protrusion. (Tr. 137-38.)

On April 15, 2003, A. Lopez, M.D., reviewed Lewis's medical record on behalf of the Social Security Administration. (Tr. 153-60.)  He concluded that Lewis could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and perform unlimited pushing and pulling. (Tr. 154.)  He also opined that she could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 155.)  Dr. Lopez, however, assigned no manipulative, visual, communicative, or environmental limitations. (Tr. 156-57.)  His opinion was later affirmed by another state agency physician. (Tr. 160.)

On April 25, 2003, Lewis returned to Dr. Miller, complaining of some paresthesias in her

left arm, as well as occasionally in her left leg. (Tr. 134.)  Dr. Miller affirmed his diagnosis of degenerative joint disease and prescribed an anti-inflammatory medication, as well as a hand splint. (Tr. 134.)

On August 13, 2003, Lewis saw Dr. Miller for a follow-up appointment, complaining that she was depressed. (Tr. 206.)  Dr. Miller recommended that she continue taking an anti-depressant medication and gave her some free samples.[5] (Tr. 206.)

On October 2, 2003, Lewis visited Dr. Miller, reporting that she was still feeling depressed and that her neck and back pain were worsening, but that the anti-inflammatory medication he prescribed seemed to "help a little bit." (Tr. 205.)  As a result, Dr. Miller adjusted her medication. (Tr. 205.)

On November 13, 2003, upon referral of Dr. Miller, Lewis visited Thomas Lazoff, M.D., a physiatrist, complaining of an eight-year history of increasing neck and back pain. (Tr. 164.)  Upon examination, Dr. Lazoff noted that Lewis had some tightness and tenderness in the thoracolumbar paravertebral region and limited range of motion of her cervical and lumbar spine. (Tr. 165.)  However, her sitting straight leg raise test was negative; she had no cyanosis, clubbing, or edema; and she presented full muscle strength, intact sensation, and normal reflexes. (Tr. 165.)  Dr. Lazoff diagnosed her with lumbar spinal stenosis and significant degenerative changes in the cervical spine. (Tr. 166.)  He prescribed an oral corticosteriod for two weeks, noting that if there was no significant improvement, Lewis should consider corticosteroid injections and physical therapy. (Tr. 166.)  He recommended that Lewis follow up with him in

---

[5] Three months later, Lewis admitted to Dr. Lazoff that she never started taking the anti-depressant medication (Effexor) that Dr. Miller had prescribed and given her samples of. (Tr. 168.)

three to four weeks. (Tr. 166.)

On August 14, 2004, Plaintiff underwent an MRI of her cervical spine, which revealed no changes in comparison to her March 2003 scan. (Tr. 259.)  A lumbar spine MRI scan revealed degenerative changes and anterior listhesis at L4-L5 with minimal inferior narrowing of both intervertebral foramina at the same level. (Tr. 260.)

Upon referral by Dr. Miller, on September 8, 2004, Lewis consulted Isa Canavati, M.D., a neurosurgeon, complaining of a seven-year history of neck pain, lower back pain, and muscle cramps in both her upper and lower extremities, which she stated were aggravated by any form of physical activity such as heavy lifting and prolonged standing and walking. (Tr. 274.)  Upon examination, Dr. Canavati noted that Lewis had tenderness in the posterior cervical and mid-lumbar areas, as well as reduced range of motion in her cervical and lumbar spine. (Tr. 274-75.)  However, Lewis's motor examination was normal, her reflexes were low normal, and her sensory examination was unremarkable. (Tr. 275.)  Dr. Canavati assigned Lewis a diagnosis of C4 through C7 degenerative disk disease, mild central disk protrusion, L2 through L5 advanced degenerative disk disease, disk protrusion, and mild spondylolisthesis at L4-L5. (Tr. 275.)  Dr. Canavati concluded that Lewis was not a good surgical candidate because of the multi-level degenerative changes of her cervical and lumbar spine and recommended instead that she pursue conservative treatment and pain management. (Tr. 275.)

On December 12, 2004, Dr. Lazoff completed a restriction worksheet, stating that Lewis could work with the following restrictions until her next office visit with him: must alternate between sitting and standing; no squatting, climbing, pushing, pulling, or unprotected heights; only occasional bending, twisting, or stretching; and no lifting over ten pounds. (Tr. 280.)

### C.  The ALJ's Decision

On April 18, 2005, the ALJ rendered his opinion. (Tr. 11-23.)  He found at step one of the five-step analysis that Lewis had not engaged in substantial gainful activity since her alleged onset date,[6] and at step two that she had a severe impairment with respect to her degenerative disk disease. (Tr. 16-19, 22.)  However, at step three, he determined that her impairments were not severe enough to meet a listing. (Tr. 18-19, 22.)  Before proceeding to step four, the ALJ determined that Lewis had the residual functional capacity ("RFC") to perform light exertional level work. (Tr. 21-22.)  Based on this RFC and relying on the testimony of a vocational expert, the ALJ concluded at step four that Lewis could perform her past relevant work as a waitress, bartender, small parts assembler, and secretary. (Tr. 21-22.)  Therefore, Lewis's claim for DIB and WIB was denied. (Tr. 21-22.)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants a district court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227

---

[6] While the ALJ concluded in the findings section of his opinion that Lewis had not engaged in substantial gainful activity since her alleged onset date, he stated in the body of his opinion at step one that Lewis *had* "engaged in a significant period of disqualifying [substantial gainful activity] from January 2001 through December 2001 and again from May 2002 through conservatively at least August 2003." (Tr. 16, 22.)  This discrepancy perhaps stems from Lewis's assertion in her opening brief that she "was confused" when she submitted a September 1, 2001, onset date in her DIB application, claiming that she amended her onset date at the hearing to September 1, 2003. (Opening Br. at 5 n.1.)

This discrepancy regarding Lewis's performance of substantial gainful activity, however, is ultimately of no consequence since the ALJ determined that Lewis was not disabled at step four of his opinion. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).  To elaborate, if the ALJ used the onset date of September 1, 2001, Lewis's application would not progress past step one due to her performance of disqualifying substantial gainful activity.  If the ALJ used the onset date of September 1, 2003, Lewis's application fails at step four, which is what ultimately occurred.

F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, a district court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## V.  THE LAW

To be considered disabled under the Act, a claimant must establish that she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."[7] 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The impairment must be severe, causing the claimant to be unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

---

[7] The standard for determining disability with respect to WIB claims is the same standard applied to wage earners articulated in this Section. *See* 42 U.S.C. § 402(e)(1)(B).

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[8] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## VI.  ANALYSIS

Lewis alleges four errors in the Commissioner's final decision.  Specifically, Lewis asserts that the ALJ erred by: (1) failing to assign controlling weight to the opinions of Dr. Lazoff and Dr. Canavati; (2) discounting the credibility of her testimony concerning her debilitating limitations; (3) improperly considering her depression; and (4) failing to consider her receipt of Indiana Medicaid benefits.  While each argument will be discussed in turn, none is ultimately successful.

### A.  The ALJ Did Not Err By Declining to Assign Controlling Weight to the Opinions of Dr. Lazoff and Dr. Canavati

First, Lewis asserts that the ALJ erred by failing to assign controlling weight to the opinions of Dr. Lazoff and Dr. Canavati, whom she contends are her treating medical specialists.  Lewis's first argument, however, is far from convincing.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a

---

[8] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."[9] *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

As to the medical opinions of other physicians, the Commissioner must "evaluate every medical opinion [it] receive[s]." 20 C.F.R. 404.1527(d).  Each medical opinion, other than a treating physician's opinion entitled to controlling weight, must be evaluated pursuant to factors set forth in 20 C.F.R. § 404.1527(d) to determine the proper weight to apply to it. *See* SSR 96-

_____

[9] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

2p; *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005); *Windus v. Barnhart*, 345 F. Supp. 2d 928, 939-43 (E.D. Wis. 2004).

## 1. Dr. Lazoff's Opinion

Lewis argues that the ALJ should have assigned controlling weight to the opinion of Dr. Lazoff, whom she contends "issued significant restrictions which placed [her] in less than the full range of sedentary work." (Opening Br. at 10.)  However, Dr. Lazoff can hardly be viewed as Lewis's treating physician, as the record indicates that he saw Lewis only once for an orthopaedic consultation. *See Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000) (explaining that the policy of assigning greater weight to a treating physician's opinion is based upon the Social Security Administration's belief that a treating physician is likely to be the medical professional most able to observe the claimant *over a long period of time*).

Furthermore, the ALJ sufficiently explained why he chose to discount the restrictions recommended by Dr. Lazoff. *See generally Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995) (affirming an ALJ's opinion that offered "specific, legitimate reasons" for discounting a physician's opinion of the claimant's residual functional capacity).  The ALJ observed that the record did not reflect that Dr. Lazoff ever saw Lewis after her first appointment with him in November 2003. (Tr. 20.)  Thus, the ALJ inferred that Dr. Lazoff's opinion in December 2004 imposing these restrictions was "apparently based on findings made more than one year prior." (Tr. 20); *see Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (emphasizing that an ALJ is entitled to make reasonable inferences from the evidence before him).  Lewis disputes this inference, asserting that "[t]he only fair inference to be made was that these restrictions were made after consultation with [Lewis], her primary care physician, and probably with knowledge

14

of Dr. Canavati's opinion" as "[m]edical specialists do not issue work restrictions *willy nilly.*" (Opening Br. at 10 (emphasis in original).)

Contrary to Lewis's argument, the ALJ's inference that Dr. Lazoff's opinion was rendered from a dated clinical examination is certainly reasonable.  In fact, it is perhaps more reasonable than Lewis's alternative hypothesis, since the record gives no indication that a consultation between Dr. Lazoff and Lewis, Dr. Miller, or Dr. Canavati ever took place. *See generally Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.").

Moreover, while Dr. Lazoff's restrictions were more limiting than those recommended by Dr. Lopez and ultimately adopted by the ALJ, Dr. Lazoff did not limit Lewis to strictly sedentary work as she suggests.  Though he did incorporate a requirement of alternate sitting and standing, he did *not* limit the amount of standing or walking that Lewis could do during an eight-hour workday. *See* SSR 83-10 (stating that "the primary difference between sedentary and most light jobs" is that light work "requires a good deal of walking or standing").

In any event, while Dr. Lazoff's opinion concerning Lewis's return-to-work capacity constituted evidence for the ALJ to consider, Lewis's RFC was a determination ultimately reserved to the ALJ. S*ee* 20 C.F.R. § 404.1527(e); SSR 96-5p.  The Court will not accept Lewis's plea to merely reweigh the evidence in the hope that it will come out in her favor this time. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (emphasizing that a court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner," rather its "task is limited to

determining whether the ALJ's factual findings are supported by substantial evidence").

Therefore, Lewis's argument that the ALJ erred by failing to assign controlling weight to Dr. Lazoff's opinion will provide her with no relief.

## 2. Dr. Canavati's Opinion

Lewis also contends that the ALJ mischaracterized the opinion of Dr. Canavati, whom she claims is her treating neurosurgeon, asserting that the ALJ's conclusions were "inconsistent with the clear position of [Dr. Canavati]." (Opening Br. at 8.)  However, Dr. Canavati, like Dr. Lazoff, can hardly be considered a treating physician, when the record indicates that he saw Lewis only once for a neurosurgical consultation. *See Smith*, 231 F.3d at 440.

Furthermore, as to her specific contentions, Lewis merely nitpicks the ALJ's summary of Dr. Canavati's opinion, falling utterly short of identifying any "fatal gaps or contradictions" that would necessitate a remand. *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (articulating that a court should give an ALJ's opinion "a commonsensical reading rather than nitpicking at it"); *see also Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).  For example, Lewis first chastises the ALJ for referring to Dr. Canavati as a neurologist, rather than a neurosurgeon, yet never explains how this reference to Dr. Canavati's specialty could constitute anything other than mere harmless error. (Opening Br. at 9); *see generally Shramek*, 226 F.3d at 814.

Lewis also criticizes the ALJ for stating that her cervical pain was aggravated by "heavy lifting and prolonged standing and walking," when Dr. Canavati stated that her pain was aggravated "with *any form of physical activity*, such as heavy lifting, prolonged standing and walking." (Tr. 20, 263 (emphasis added); Opening Br. at 9.)  However, Lewis's nit is of no real consequence, as Dr. Canavati made this statement in the beginning of his report where he noted

16

Lewis's subjective complaints, *not* in the section where he rendered his clinical opinion. (*See* Tr. 263); *see generally Rice*, 384 F.3d at 371 ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").

Next, Lewis contends that the ALJ "ignored the comprehensive scope of Dr. Canavati's opinion" concerning Lewis's tenderness and range of motion by stating that she has "*complaints of* tenderness" in the posterior cervical area and "*some* reduced range of motion," when in fact Dr. Canavati stated that she "*has* tenderness" in the posterior cervical area and "restriction in *all* motions of the lumbar and cervical spine." (Tr. 20, 263 (emphasis added); Opening Br. at 9-10.) However, when donning "commonsensical" lenses, the ALJ's summary of Dr. Canavati's clinical findings concerning Lewis's posterior cervical tenderness and reduced range of motion were sufficiently accurate. *See Rice*, 384 F.3d at 371 (rejecting a claimant's assertion that the ALJ mischaracterized her testimony, stating that the claimant's argument amounted to "nothing more than a dislike of the ALJ's phraseology").

Finally, Lewis argues that the ALJ improperly "leaves the impression" that the reason Dr. Canavati recommended conservative treatment for Lewis was because the degenerative disk disease was not that severe. (Opening Br. at 10.)  Lewis instead contends that a fair reading of Dr. Canavati's opinion suggests that he recommended conservative treatment because her "problem is so bad that surgery will not fix it." (Opening Br. at 10.)  Contrary to Lewis's argument, there is absolutely no support in the record for her assertion, as Dr. Canavati stated that he favored conservative treatment for Lewis because of the "multi-level degenerative changes" in both her cervical and lumbar spine. (Tr. 263.)  In his opinion, the ALJ simply

17

reiterated Dr. Canavati's recommendation that Lewis pursue conservative treatment, never

suggesting that her degenerative disk disease was anything but "severe," the conclusion he

reached at step two of his analysis. (*See* Tr. 17, 18.)

Clearly, Lewis's attempt to nitpick the ALJ's summary of Dr. Canavati's opinion is

unfruitful, as she fails to identify any fatal gaps or contradictions that would necessitate a remand

in this instance.[10]

### B. The ALJ's Credibility Determination Is Supported by Substantial Evidence

Next, Lewis contends that the ALJ erred when he determined that her testimony of

debilitating pain was not "fully credible nor supported by the objective medical evidence of

record." (Tr. 21; Opening Br. at 11.)  Lewis's second argument, however, is as unpersuasive as

her first.

Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

If an ALJ's determination is grounded in the record and articulates his analysis of the evidence

"at least at a minimal level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v.

Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge

between the evidence and the result," *Shramek*, 226 F.3d at 811, his determination will be upheld

unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d

751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's

decision was based on "serious errors in reasoning rather than merely the demeanor of the

---

[10] Because Lewis's argument that the opinions of Dr. Lazoff and Dr. Canavati should have been assigned
controlling weight fails, her contention that the ALJ erred by failing to determine at step five whether she could
perform sedentary work is also unsuccessful and warrants no further discussion. (Opening Br. at 11-12.)

witness").

Here, Lewis argues that an ALJ must give credit to a claimant's complaints when they are consistent with the objective medical evidence. (Opening Br. at 11.)  Thus, as Lewis's argument goes, the ALJ was *required* to fully credit her complaints of pain because Lewis "testified to pain levels and symptoms that were . . . consistent with multi-level degenerative disk disease," a condition reasonably expected to cause back pain. (Opening Br. at 11.)

Contrary to Lewis's argument, the ALJ determined that not all of her complaints were supported by the objective medical evidence.  Rather, the ALJ opined that Lewis's testimony "that her hands become cold and limp and just hang there once every couple of months" was *not* supported by the medical evidence, noting that this condition is not mentioned in her medical evaluation or treatment records. (Tr. 21); *see* 20 C.F.R. § 404.1529;  *Smith*, 231 F.3d at 439 ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); SSR 96-7p.

Furthermore, Lewis misconstrues the legal standard governing an ALJ's evaluation of a claimant's credibility.  Once an ALJ determines that a claimant has established a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged, such as degenerative disk disease in this instance, the ALJ *then* evaluates the intensity and persistence of these symptoms in order to determine their effect on the claimant's ability to work. *See* 20 C.F.R. § 404.1529; SSR 96-7p.  In doing so, the ALJ considers the objective medical evidence, as well as other evidence, such as the claimant's daily activities; the location, duration, frequency, and intensity of pain and other symptoms; any predicating and aggravating factors to the pain and symptoms; and the type, dosage, effectiveness, and side

effects of medication; and any other measures taken to alleviate the pain and symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p.

Here, the ALJ first commented that Lewis's testimony of chronic back pain at a level "ten" was inconsistent with her lack of prescribed narcotic pain medication. (Tr. 21.)  He then explained that her testimony of severe pain was inconsistent with her performance of a full range of activities of daily living, opining that her daily activities "would seemingly be considerably more limited given her great level of reported pain." (Tr. 21); *see Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005) (considering a claimant's performance of daily activities as a factor when discounting the claimant's credibility); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). In addition, the ALJ found Lewis's statement that she frequently received free samples of anti-depressant medication from her physician inconsistent with her statement that she could not take the medication because of her financial status. (Tr. 21); *see* 20 C.F.R. § 404.1529; *Smith*, 231 F.3d at 440; *Luna*, 22 F.3d at 691 (considering claimant's failure to seek medical treatment and sporadic use of pain medication when discounting claimant's complaints of severe pain); SSR 96-7p.

Clearly, the ALJ built an accurate and logical bridge between the evidence and his credibility determination, and his determination is not "patently wrong."  Thus, it is recommended that his credibility determination be affirmed.

### C. The ALJ Sufficiently Considered That Lewis Suffered From Depression

Lewis also contends that the ALJ's consideration of her depression was "incorrect," asserting that the facts pertaining to her depression were "not adequately analyzed or discussed by the ALJ." (Opening Br. at 11.)  Ultimately, this argument is another loser for Lewis, as the

ALJ addressed her depression in great detail in his opinion.

To elaborate, the ALJ thoroughly addressed Lewis's depression at step two of his analysis, where he concluded that it "does not cause more than mild limitations of function, and therefore . . . is not a severe condition." (Tr. 17.)  In arriving at this conclusion, the ALJ noted that Lewis's depression was situational in nature, arising from her complaints of pain. (Tr. 17.) He also considered that Lewis never received, nor was referred for, any psychiatric or psychological counseling or treatment. (Tr. 17.)

In addition, the ALJ considered that Lewis only took anti-depressant medication intermittently, finding that Lewis's reason (financial constraints) for her inconsistent use of medication was not entirely credible since Dr. Miller frequently provided her with free samples of medication. (Tr. 18, 21.)  Also, while Lewis argues that her need for anti-depressant medication increased as her degenerative disk disease worsened, she fails to cite to any medical evidence to substantiate this proposition, and the Court has not noted any such evidence in its own review of the record. (Opening Br. at 11); *see Schmidt*, 395 F.3d at 747 (concluding that an ALJ's determination was supported by substantial evidence where a claimant's contentions to the contrary "did not point to any specific evidence contradicting the ALJ's conclusion").

Moreover, the ALJ also considered as a factor in his credibility determination that despite her depression, Lewis performs a full range of daily activities, albeit at a slower pace. (Tr. 18.) He noted that her performance of these activities was consistent with only mild limitations of function and opined that she retains "a significant capacity of maintaining social functioning, as well as . . . maintain[ing] concentration, persistence, and pace." (Tr. 18.)

In summary, the ALJ adequately articulated his reasoning in reaching his determination

21

that Lewis's depression causes only mild functional limitations, and his determination is supported by substantial evidence.  Thus, Lewis's argument that the ALJ addressed her depression "incorrectly" is baseless.

### D.  The ALJ Was Not Required To Consider Lewis's Receipt of Medicaid Benefits

Finally, Lewis argues that the ALJ erred by failing to give "some weight" to her testimony that she receives Indiana Medicaid benefits. (Opening Br. at 12.)  More specifically, Lewis contends that her receipt of Indiana Medicaid benefits offers evidence of her disability, asserting that an adult without minor children must be disabled to be eligible for Indiana Medicaid and that "the Indiana Medicaid system and the Social Security Disability system are very similar." (Opening Br. at 14.)  In advancing this argument, Lewis goes so far as to assert that an "ALJ may give less weight to a[n] Indiana Medicaid decision if he gives persuasive, specific, and valid reasons for doing so that are supported by the record."[11] (Opening Br. at 15.)

Contrary to Lewis's argument, an ALJ "is not bound by findings made by either a governmental or nongovernmental agency concerning whether the claimant is disabled." *Clifford*, 227 F.3d at 874 (citing 20 C.F.R. § 416.904).  Rather, an ALJ "must independently determine if a claimant is 'disabled' as defined solely in the Social Security Act." *Id.*  In short, an ALJ "is not required to (but may) consider the disability finding of other agencies." *Id.*

Clearly, under Seventh Circuit case law the ALJ was not required to consider Lewis's

---

[11] Not surprisingly, Lewis cites no authority for this contention.

receipt of Indiana Medicaid benefits in reaching his determination.  Furthermore, since Lewis never submitted her Medicaid application or decision to explain the basis for the award of Medicaid benefits, the ALJ had no evidence to consider other than simply the fact that she receives benefits, which he *did* mention in his opinion. (Tr. 19.)  Thus, Lewis's final argument is utterly without merit and provides her with no relief from the Commissioner's final decision.[12]

## VII.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties.  NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *See* N.D. Ind. L.R. 72.1(d)(2); *see also Thomas v. Arn*, 474 U.S. 140 (1985); *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 241-42 (7th Cir. 1996).

SO ORDERED.

Enter for this 13th day of November, 2006.

S/Roger B. Cosbey _____
Roger B. Cosbey,
United States Magistrate Judge

---

[12] In addition, Lewis's request in her opening brief for fees in the event she prevailed was premature and thus is without merit. *See* 28 U.S.C. § 2412.